UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,                     CRIMINAL NO. 25-20701

v.                                  HON. SUSAN K. DECLERCQ

YUNQING JIAN,

      Defendant.

_____/

## **GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its undersigned counsel, files this sentencing memorandum to inform the Court of the government's position at sentencing. The defendant, Yunqing Jian, has unlawfully smuggled biological material into the United States on multiple occasions over several years. Most recently, Jian and her boyfriend tried to smuggle into the United States a biological pathogen that, in Jian's own words, causes "a devastating disease" in wheat and other crops. Jian has also engaged in a pattern of deceiving others about her illegal activities – including deceiving her employer and lying to law enforcement. Given the seriousness of Jian's smuggling, the fact that she has repeatedly engaged in

such conduct, and her dishonest behavior, a sentence of 24 months' imprisonment is appropriate.

BACKGROUND

1.    <u>Background on Fusarium graminearum</u>

Fusarium is a large genus of fungi. Many strains of Fusarium are harmless; however, some species can negatively affect crop, human, and animal health. According to an article from the journal *Molecular Plant Pathology*, entitled "Heading for disaster: Fusarium graminearum on cereal crops," Fusarium graminearum is a strain of this plant pathogen which causes "head blight," a devastating disease on wheat, barley, maize, and rice. Head blight negatively effects crops by reducing yields and producing a toxin that causes vomiting, liver damage, and reproductive defects in livestock and humans. Crops are often tested for this toxin after harvesting. Harvests that are contaminated with the toxin are worth less money the higher the toxin level. And if toxin levels are too high, the harvest cannot be used at all and is a complete financial loss.

Historically, outbreaks from head blight "were infrequent and limited to small, isolated areas in the United States and Canada." *An Overview of Fusarium*

*Head Blight*, Crop Protection Network, 11/3/2021.[1] But for several years in the 1990s, a massive and prolonged outbreak occurred in North America. Since the 1990s, head blight "has emerged as one of the most significant diseases affecting small grain production, with epidemics occurring at higher frequencies and over a larger area than in the past." *Id.* Currently, head blight "related losses to farmers, food processors, and brewers is estimated to run in the hundreds of millions of dollars annually." *United States Wheat & Barley Scab Initiative* (available at www.scabusa.org/index.php/about).

According to the Michigan Wheat Program (MWP), there are 8,000 wheat farmers in Michigan located in 50 counties who annually plant more than 500,000 acres of wheat, resulting in the production of 40 million bushels worth more than $200 million.[2] According to the MWP, Fusarium graminearum "is the single most important wheat disease." *Michigan Wheat 101, A Guide for Soft Winter Wheat Production in Michigan*, Michigan Wheat Program and Michigan State University Extension, p.22.[3] While some techniques can help mitigate the harm from head blight, the "[r]isk of the disease cannot be totally avoided." *Id.* This is because

---

[1] Available at: https://cropprotectionnetwork.org/publications/an-overview-of-fusarium-head-blight
[2] Available at: https://miwheat.org/about-the-michigan-wheat-program/
[3] Available at: www.bigwclients.com/miwheat/michigan-wheat-101/

3

climate and the weather "has the greatest influence on disease development." *Id.* Damp conditions and moderately warm temperatures – which accurately describes the weather in Michigan for a considerable part of the year – "are the most advantageous to the pathogen." *Id.* Mitigation measures that do exist – such as applying fungicides, planting different wheat varieties, and rotating crops – can only blunt the risk from Fusarium graminearum, not eliminate it. For example, fungicides can reduce head blight severity "by 50-60%" under perfect conditions, but "the actual reductions are highly variable," because the chemicals must be applied during a short window of time when the wheat is flowering. *Id.* at 22-23. Complicating these mitigation measures is the fact that numerous Fusarium graminearum species exist and each is evolving and developing over time.

This dynamic was described by the defendant herself in a coauthored paper published in 2022.[4] According to the defendant, Fusarium head blight "is a devastating disease" that causes "huge crop yield and economic losses" and "contaminates food and feed . . . thereby imposing harmful effects on human and animal health." Although fungicides are used to help control the disease, "serious fungicide resistance has emerged in the last few years, which reduces efficacy of

---

[4] "*The very long-chain fatty acid elongase FgElo2 governs tebuconazole sensitivity and virulence in Fusarium graminearum*," Applied Microbiology International, vol. 24, 2022, at p. 5362.

the compounds." The overuse of the fungicides has led to "resistant Fg populations in many regions of China, which is accompanied by the increase in [toxin] production."

      2.    <u>Background on the regulation of imports of plant pathogens</u>

The United States government heavily regulates the importation of plant pathogens, like Fusarium graminearum. It does so pursuant to the Plant Protection Act, 7 U.S.C. §§ 7701 – 7784, and the Federal Plant Pest Regulations, 7 C.F.R. §§ 330.100 – 330.207, which are administered by the U.S. Department of Agriculture (USDA). These laws are based on Congress's finding that the detection, control, and eradication of plant pathogens "is necessary for the protection of the agriculture, environment and economy of the United States." 7 U.S.C. § 7701(1).

These laws prohibit any person from importing into the United States any organism like Fusarium graminearum that "directly or indirectly injures, causes damage to, or causes disease in a plant or plant product" without first applying for and obtaining a permit from the USDA. 7 C.F.R. § 330.200. An individual who seeks to import such an organism must inform the USDA of the site and facility where the organism will be stored so that the USDA can determine in advance whether the facility is "constructed and maintained in a manner that prevents the dissemination or dispersal" of the organism. *Id.* According to records maintained

by the USDA, the defendant has never applied for, nor has she been issued, a permit to import biological material into the United States.

3. Jian's Research on Fusarium graminearum in China

Jian is a citizen of the People's Republic of China (PRC) who obtained her doctorate degree in plant pathogens from Zhejiang University in China in 2020. Following the completion of her doctoral degree, Jian became a postdoctoral scholar at Zhejiang University. Jian's postdoctoral work was funded by a science foundation in the PRC that is administered by the PRC government. According to its website, the foundation's purpose is to promote the "rapid growth" of "high-level researchers" in the PRC.[5] Jian's postdoctoral work focused on Fusarium graminearum and she authored or coauthored six published scientific articles from 2019 to 2022. All of them were about Fusarium graminearum, and two of them were coauthored with Zunyong Liu.

Jian was in a romantic relationship with Zunyong Liu, who also obtained his doctorate from Zhejiang University and focused his work on Fusarium graminearum. From 2014 to 2023, Liu co-authored at least six peer-reviewed scientific articles about Fusarium. Four of these articles were related to Fusarium

---

[5] China Postdoctoral Science Foundation (available at https://english.chinapostdoctor.org.cn/system/index.html).

graminearum. While Jian was in the PRC conducting her research on Fusarium graminearum, Liu was conducting postdoctoral work on plant pathogens at a laboratory at a university in Texas.

At the same time Jian was receiving funding from the PRC foundation, she applied for a J1 visa from the U.S. Department of State. The J1 visa allowed Jian to enter the United States to conduct research at the same university laboratory in Texas where Liu was working. As part of her visa application, Jian submitted a research plan indicating that she intended to study topics distinct and different from the study of Fusarium graminearum. Jian's application also included a letter from the university in Texas stating that the university would pay Jian an annual salary of $46,000. Jian was issued a J1 visa on August 2, 2022.

4.     <u>Jian engages in illegal smuggling from the start</u>

As Jian was preparing to travel to the United States, she exchanged the following electronic messages with Liu discussing the smuggling of seeds into the United States:

LIU:        You need to pick up your luggage when you go through customs.

JIAN:       That is to say, in San Francisco

LIU:        Yes.

JIAN:       And then go through security again?

7

| | |
|---|---|
| LIU: | So be careful. |
| JIAN: | OK. |
| LIU: | Teacher Liang's seeds must be placed well. |
| JIAN: | Where to put it? I only have one pair of shoes. The insole cannot be pulled off. |
| LIU: | Did you bring just one pair of shoes |
| JIAN: | 3 pair, wear one pair. |
| LIU: | Where did the seeds get put? In the tube? |
| JIAN: | I put them in my Martin boots… in a small bag. The ziplock bag. Very small. |
| LIU: | That's good… Just put it in your shoes. |
| JIAN: | I stuffed them in the shoes. |

The day after this conversation took place, Jian arrived at San Francisco International Airport on a flight from Seoul, South Korea, to begin her work at the university in Texas. A review of records regarding Jian's entry into the United States did not show that she declared the importation of any biological materials.

5.    Jian is hired by the University of Michigan

Jian and Liu worked at the university in Texas until August, 2023, at which time they both were hired to work at the Molecular Plant-Microbe Interaction (MPMI) Laboratory at the University of Michigan. Jian's employment included an

8

annual salary of $52,000 and an allocation of 100% effort, meaning that all Jian's work at the University of Michigan would be conducted within the scope of her employment in the MPMI Laboratory. Jian's offer letter from the University of Michigan also required her to "disclose for pre-approval any additional employment (i.e., outside the university or in addition to the research fellow position reference in this offer) prior to accepting such an arrangement." Jian's employment at the University of Michigan was for one year, but was subsequently extended to August 27, 2025. As was the case at the university in Texas, the MPMI Laboratory did not assign Jian to work on Fusarium graminearum. In fact, the MPMI Laboratory did not have permits from the USDA to work on Fusarium graminearum.

6. <u>Jian engages in several instances of smuggling while working at the University of Michigan</u>

While working at the MPMI Laboratory, Jian exchanged electronic messages with Xia Chen, an individual in the PRC. In these messages, Jian requested that Chen send Jian some plasmids from China. Jian gave Chen a description of the materials she was requesting and an associated photograph, and Jian specifically requested material with the label "06172-pyfl1-GFP." As described further below, the label "06172" is associated with a subsequent effort by Jian and Liu to smuggle Fusarium graminearum into the United States.

Jian gave detailed instructions through text and audio messages to Chen on the preparation of the materials to be shipped. Jian instructed Chen on how Chen should prepare the materials, including the steps required to prepare the filter paper – such as drawing circles on the paper, numbering it, and telling Jian what the numbers were for her reference. Jian provided her personal address in Michigan as the mailing address for the package and her personal phone number.

After providing her mailing address, Jian instructed Chen to cut the filter paper into smaller pieces, place the pieces into a small Ziplock bag, and slide the bag into a book, preferably a thicker book, to send over. Chen asked Jian if the book would be inspected, and Jian replied, "There are usually no problems. Rest assured. I have mailed these before."

On or around January 19, 2024, Chen reported to Jian that the package had been sent out. Chen sent a picture of the concealed filter paper and a corresponding text message stating that this was how "it" looked inside the book. *See* Figure 1.

*Figure 1*



On January 22, 2024, CBP Officers in Louisville, Kentucky, inspected a shipment manifested as "Doc" from Xia Chen of Zhejiang University in the PRC destined to Jian at her home address. Upon inspection, CBP Officers observed a used statistics textbook with fifteen circles of filter paper containing unknown substances.  The CBP Officers took photographs of the textbook and filter paper and subsequently destroyed the biological material. *See* Figure 2.

*Figure 2*



11

During the 2024 calendar year, federal law enforcement flagged three additional packages containing unknown biological materials – peptides, filter paper, and other unknown substances – that were sent to Jian, two of which were addressed to her residence. These packages contained unknown biological substances concealed within pages of other documents or books, were manifested incorrectly, or lacked documentation required for proper importation.

    7.    <u>Liu smuggles Fusarium graminearum into the United States</u>

In April, 2024, Liu's employment agreement with the University of Michigan expired. Liu left the United States and returned to the PRC on April 30, 2024. On or around May 1, 2024, Jian and Liu exchanged the following electronic messages about one of Jian's supervisors at the MPMI Laboratory finding Liu's Fusarium graminearum:

| | |
|---|---|
| JIAN: | I just went down to help with your plants. Fortunately, I went. |
| LIU: | Did the boss and her team inspect it? |
| JIAN: | Met them on patrol. Yes. |
| LIU: | All right. That's such a coincidence. |
| JIAN: | Your cell death phenotype plants were seen by [the principal investigator]. |
| LIU: | What did you say? |

JIAN:       She asked me what it was. I said it was Zunyong's leftover plant… She said it has a strong phenotype. Your label clearly states your name.

LIU:        What should I do then?... She didn't say anything else, did she?... I usually put it on the top shelf… I forgot this time and put it below.

JIAN:       She asked me what this phenotype was… I said it should be effector… There's nothing I can do… It really pushed me to the brink of despair. She said what is the effector.

LIU:        Was she angry?

JIAN:       I said it was Fusarium. No… She also asked me if you had detected it before. She thought it was Fo's… I didn't dare tell her it was Fg… Fortunately I didn't say it was Fg. That's even more serious.

The MPMI Laboratory had permits from the USDA to study Fusariam oxysporum ("Fo") but did not have permits to study Fusarium graminearum ("Fg").

On July 9, 2024, Jian and Liu exchanged several messages about harvesting seeds, including an argument in which Jian told Liu "don't come," and to "find someone else" to harvest seeds for him. Liu responded that Jian should just "throw them away." By July 20, 2024, the two had patched things up and Liu sent Jian a long message discussing "Fusarium graminearum (Fg) inoculation in wheat." On July 27, 2024, Jian told Liu that it was "a pity that I still have to work for you." Liu responded that "[o]nce this is done, everything else will be easy."

13

That same day, Liu arrived at the McNamara Terminal of Detroit Metropolitan Airport on a flight from the PRC. During an inspection by CBP Officers, Liu stated that he did not have any pending or approved petitions that would allow him to work, study, or reside in the United States. When asked about the purpose of his travel, Liu stated that he was entering the United States to visit his girlfriend, Jian, for approximately one month and then returning to work at Zhejiang University to start his own laboratory. Liu further stated that he had no work materials with him.

CBP Officers conducted an examination of Liu's baggage and found a wad of tissues crumpled up in a small pocket in Liu's backpack. The tissues concealed a note in Chinese, a round piece of filter paper with a series of circles drawn on it, and four clear plastic baggies with small clumps of reddish plant material inside. *See* Figure 3 and 4.



*Figure 3*          *Figure 4*

Liu initially denied knowing what the materials were and stated that someone else must have put them into his bag. After further questioning, Liu stated that he intentionally hid the samples in his backpack because he knew there were restrictions on the importation of the materials. Liu confirmed that he had intentionally put the samples in a wad of tissues so CBP Officers would be less likely to find and confiscate them, and he could continue his research in the United States. Liu stated that the materials were different strains of the pathogen Fusarium graminearum. Liu also stated that he planned to clone the different strains of Fusarium graminearum contained on the filter paper and make more samples if the experiments on the reddish plant material failed. Liu said that he intended to use the MPMI Laboratory to conduct research using the biological materials found in his backpack. Liu stated that, while he was in the United States, he would have free access to the MPMI Laboratory on some days, and that other days Jian would give him access to conduct his research.

An FBI laboratory performed testing on the biological materials that Liu smuggled into the United States, which revealed that the filter paper contained Fusarium graminearum. The FBI laboratory identified 10 separate samples from the filter paper. Each sample had a hand drawn circle around it, and each circle was labeled with a code containing letters and/or numbers. The sample labeled "06172"

was identified by the FBI laboratory to contain the DNA sequence for Fusarium graminearum. FBI testing also revealed that the baggies contained fibrous material (Figure 5) that was infected with Fusarium graminearum (Figure 6) that had been genetically altered in a way that created "an unknown function." When examined under a microscope, the fibrous material and fungi appeared as follows:

*Figure 5*



*Figure 6*



8.   Jian and Liu continued to work on Fusarium graminearum while at the MPMI Laboratory

Jian's and Liu's smuggling was part of a broader effort to continue working on Fusarium graminearum for the PRC while they were in the United States. While Jian was working at the MPMI Laboratory, she completed a set of documents for the PRC foundation that was providing her funding. These documents detailed her work on Fusarium graminearum and provided a financial accounting for how she

used the foundation's funding. According to these documents, Jian received over $77,000 from the PRC foundation to research Fusarium graminearum from July, 2020, to June, 2024. Jian signed and dated this set of documents on June 9, 2024.

In addition, from 2023 onward – while Jian was working at the laboratory in Texas and the MPMI Laboratory in Michigan – Jian authored or coauthored five published scientific papers. All of them were focused on Fusarium graminearum, and two of them were coauthored with Liu. In fact, on September 16, 2024 – just two months after Liu was caught smuggling Fusarium graminearum into the United States – both Jian and Liu submitted a research paper on Fusarium graminearum to the journal *Phytopathology Research*. The research paper was published in June, 2025. According to the paper, Jian and Liu "conceived and supervised the project . . . performed the experiments . . . [and] wrote the manuscript." The experiments included creating genetic "mutants" of Fusarium graminearum and then growing those mutants in various conditions. According to the paper, the funding for this research came from money obtained by Liu from the PRC government.

9.    Jian Lies to the FBI about Fusarium graminearum

On February 5, 2025, FBI Special Agents interviewed Jian at the MPMI Laboratory. During the interview, Jian identified herself as Liu's girlfriend. When

17

asked about the purpose of Liu's travel to the United States in July of 2024, Jian

stated that Liu was traveling to visit her for summer vacation. Jian stated that Liu is

a faculty member at Zhejiang University and studies Fusarium graminearum. Jian

also admitted to helping Liu study Fusarium graminearum in the PRC. But she

falsely denied helping him do so at the MPMI Laboratory. Jian also falsely denied

knowing that Liu was planning to study in the United States or bring samples of

biological materials into the United States. Jian falsely claimed to have first

learned about the smuggling after Liu was caught by CBP. Jian repeated that she

was "100 percent sure . . . I didn't know anything about it until this thing

happened." When asked if she had ever assisted Liu with his research on Fusarium

graminearum at the MPMI Laboratory, Jian flasley stated: "Fusarium

graminearum, no. Fusarium graminearum, 100% no."

      10.    <u>Jian and Liu are charged with conspiracy and smuggling</u>

On June 2, 2025, Jian and Liu were charged in a complaint with conspiracy

(18 U.S.C. § 371) and smuggling (18 U.S.C. § 545). (ECF No. 1, PgID.1). Jian was

also charged with false statements (18 U.S.C. § 1001) and Liu was charged with

visa fraud (18 U.S.C. § 1546). *Id.* Jian was arrested the same day and consented to

pre-trial detention. On September 17, 2025, Jian was charged with the same crimes

in an Information. (ECF No. 22, PgID.55). Specifically, Count 1 of the Information

charges conspiracy to smuggle; Count 2 charges smuggling; and Count 3 charges false statements. A combined plea and sentencing hearing is scheduled for November 12, 2025. The defense has informed the government that Jian intends to enter her plea pursuant to a Rule 11 plea agreement.

ARGUMENT

In fashioning a sentence, a court shall consider, among the other factors set forth in 18 U.S.C. § 3553(a), "the nature and circumstances of the offense," "the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), the need for adequate deterrence, the need to avoid unwarranted sentencing disparities, and the applicable sentencing guidelines.

A.     The Sentencing Guidelines

The Probation Department prepared a Presentence Report that determined Jian's sentencing guideline range is 0 to 6 months' imprisonment. The defendant objects to one specific Guideline calculation, namely whether the defendant should receive a base offense level increase under Guideline §2Q2.1(b)(2)(B). The resolution of this objection will not change the applicable Guideline range, but it does impact the § 3553(a) analysis and is therefore worth discussion.

1.     <u>Section 2Q2.1(b)(2)(B) applies to Jian</u>

Section 2Q2.1(b)(2)(B) provides a two-level increase to the defendant's base offense level if the offense "otherwise created a significant risk of infestation or disease transmission potentially harmful to humans, fish, wildlife, or plants." Jian claims that this provision does not apply because the specific Fusarium graminearum that Liu smuggled into the United States on July 27, 2024, was destined for a laboratory far away from any crops, that the particular Fusarium graminearum Liu smuggled is ubiquitous, that the genetic modifications that Liu made to the specific Fusarium graminearum "likely" made it less virulent, and that Fusarium graminearum is monitored and controlled by fungicides.

The defendant's objection misses the mark for two reasons. First, whether a risk of harm was created by the specific Fusarium graminearum that Liu smuggled is not legally relevant. Both circuit courts that have examined the application of §2Q2.1(b)(2)(B) have found "the government need not prove that the offense conduct actually resulted in disease transmission or that it was necessarily harmful or dangerous to people, plants, or animals." *United States v. Eyoum*, 84 F.3d 1004, 1010 (7th Cir. 1996); *see also United States v. Narte*, 197 F.3d 959, 964 (9th Cir. 1999). This is because when a public health regulation forbids the importation of an item, "[t]he public health regulation itself represents an administrative finding"

20

that the importation created a significant risk of disease transmission harmful to humans, fish, wildlife or plants. *Id.*; *Narte*, 197 F.3d at 963 (affirming the application of §2Q2.1(b)(2)(B) because "the *very existence*" of the regulations "represented an administrative finding" that the defendant's conduct did create a significant risk) (emphasis in original)). In short, §2Q2.1(b)(2)(B) applies in situations where the defendant's conduct "violated a wildlife regulation designed to protect public health, regardless of whether the particular animals with which the offender was involved were infected with any disease." *United States v. Paluch*, 84 F. App'x 740, 746 (9th Cir. 2003).

Second, the defendant's arguments ignore the fact that she, herself, smuggled biological material into the United States on multiple prior occasions. The fact that she has skirted the law means that it is "impossible to know whether [s]he caused any actual harm" because she did not go through the required permitting process. *Narte*, 197 F.3d at 964. The defendant "cannot now use [her] illegal conduct to defeat the two-level enhancement [under §2Q2.1(b)(2)(B)]." *Id.*

      2.   <u>The Guidelines do not adequately take into account the nature of Jian's crimes</u>

Jian's Guideline range of is, of course, just "the starting point and the initial benchmark" for choosing her sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). The Guidelines reflect a "rough approximation" of sentences that might

achieve section 3553(a)'s objectives. *United States v. Rita*, 551 U.S. 338, 350 (2007). Here, Jian's Guideline range should serve as the starting point for her sentence, but not the end point. While Guideline §2Q2.1 certainly does take into account whether Jian's conduct created a risk that was potentially harmful to humans and plants, it fails to account for the *severity* of that potential harm. Smuggling the plague into the United States is treated the same under the Guidelines as smuggling Botrytis tulipae (a fungus that attacks tulips flowers). Whether a pathogen kills humans or flowers – an absolutely critical distinction – is left out of the Guideline calculus all together. Congress certainly envisioned smuggling offenses as quite serious, as demonstrated by the crime's 20 year statutory maximum penalty. But under Guideline §2Q2.1, a pathogen smuggler who had a criminal history category VI (the worst possible) and imported the plague would, at most, face a sentence of 18 to 24 months. The fact that the Guideline does not account for the severity of harm and cannot, under any circumstances, produce a guideline range that comes even close to approximating Congress's view of the seriousness of the crime means that Guideline §2Q2.1, at least as applied here, is of limited utility.

B.    The Nature and Circumstances of the Offense

Smuggling a biological pathogen into the United States that has the potential to cause damage to the food supply is extremely serious, which is why the USDA heavily regulates this area of activity. But there are several aggravating factors that makes Jian's conduct particular serious. First, Jian has engaged in smuggling activity on numerous occasions over a long period of time. In fact, she began her smuggling the first time she entered the United States on her J1 visa and has continued ever since, even telling a fellow co-conspirator who expressed concern about being caught to: "Rest assured. I have mailed these before." Second, Jian sought to deceive her supervisors at the MPMI Laboratory about the presence of Fusarium graminearum in the laboratory and sought to hide the fact that her and Liu were continuing to work on Fusarium graminearum for the PRC. Third, even after getting caught, Jian continued her deceptive practices by lying to the FBI about the presence of Fusarium graminearum in the MPMI Laboratory. All of these factors weigh in favor of a significant sentence.

C.    The History and Characteristics of the Defendant

 The defense makes much of Jian's high level of education, her scientific prowess, and her professional ambition. But these characteristics, which may seem like mitigating factors at first, actually cut against her. All of these qualities either

23

motivated Jian to commit these crimes or assisted her in doing so. Even Jian's friendly and collegial nature likely contributed to her ability to hide her illegal activities and deceive her supervisors at the MPMI Laboratory. And the fact that Jian was highly educated and experienced in this field means that she engaged in this activity knowing full well that Fusarium graminearum can cause "devastating disease." Jian, of all people, should have known better. Her experience weighs in favor of a more serious sentence.

D.     Adequate Deterrence and Protection of the Public

General deterrence and protection of the public are perhaps the most important sentencing factors. Given the volume of people and commerce entering the United States, it is impossible for law enforcement to intercept every smuggled item. Deterring would-be offenders at the outset is the best way to combat smuggling. And deterring smuggling is important. The laws that regulate the importation of biological pathogens from foreign countries are in place to protect public health, the food supply and the economy. Scientific inquiry, experiments and research papers are undoubtedly important. But so too is the health and safety of the public. Academics – even those working on important projects – do not get to decide which public safety laws they follow and which they can ignore. A significant sentence will go a long way to remind scientists and academics

everywhere – foreign and domestic – that US laws regulating the importation of biological pathogens must be followed.

        E.      <u>The need to avoid unwarranted sentencing disparities</u>

A sentence of 24 months does not create *unwarranted* sentencing disparities. True, the Sentencing Commission's data shows that most individuals with the same base offense level and criminal history score as Jian are sentenced to less than six months. But that data does not disclose the severity of harm potentially created by those other defendants' conduct. We simply do not know how many (if any) of these other defendants smuggled a biological pathogen that can create – in the defendant's own words – a "devastating disease." The one case cited by the defendant, *United States v. Chengzuan Han*, Case No. 25-20479, involved a PRC national who smuggled round worms into the United States and received a time-served sentence from Judge Leitman. But the round worms smuggled by Han were not pathogens, nor did they create any risk of disease. That important and obvious distinction matters.

What we do know is that a survey of reported and unreported decisions shows that judges commonly hand down significant sentences in cases involving the same Guideline that applies to Jian; and these cases often involve far less risk of harm than is present here. *See United States v. Martinez*, No. 23-10848, 2025

25

WL 2942795, at *1 (11th Cir. Oct. 17, 2025) (defendant sentenced to 51 months after being convicted at trial for smuggling ivory statues); *United States v. Stimac*, 40 F.4th 876, 878 (8th Cir. 2022) (defendant sentenced to 15 months after pleading guilty to two misdemeanors related to shooting a single bear while bow hunting on an Indian reservation); *United States v. Levine*, 743 F. App'x 154 (9th Cir. 2018) (defendant sentenced to 27 months after being convicted at trial for selling a single set of rhinoceros horns); *United States v. Hess*, 829 F.3d 700, 702 (8th Cir. 2016) (defendant sentenced to 27 months after being convicted at trial for selling a single set of rhinoceros horns); *Wang v. United States*, No. 13-CR-452, 2016 WL 1436679, at *3 (S.D.N.Y. Apr. 11, 2016) (defendant sentenced to 37 months after pleading guilty to smuggling rhinoceros and elephant ivory to China); *United States v. Hugs*, 507 F. App'x 738, 738 (9th Cir. 2013) (defendant sentenced to 18 months after pleading guilty to conspiracy to traffic in eagles and migratory birds). A sentence of 24 months' imprisonment does not create an unwarranted sentencing disparity.

## CONCLUSION

For the foregoing reasons, the government requests that the Court impose a sentence of 24 months' imprisonment.

Respectfully submitted,

JEROME F. GORGON JR.
United States Attorney

*s/Michael C. Martin*
Michael C. Martin
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9100
E-Mail: Michael.C.Martin@usdoj.gov

Dated:  November 7, 2025

**Certificate of Service**

I certify that on November 7, 2025, I electronically filed the Government's Sentencing Memorandum with the Clerk of the Court of the Eastern District of Michigan using the ECF system which will send notification of such filing to the following:

Norman Zalkind
David Duncan
James Gerometta
Attorneys for defendant Yunqing Jian

s/Michael C. Martin
Michael C. Martin
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9100
E-Mail: Michael.C.Martin@usdoj.gov